UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

RONNIE DAVIS,
    Plaintiff,

vs.                            06-4050

ROGER WALKER, JR., et al.
    Defendants.

## SUMMARY JUDGEMENT ORDER

This cause is before the court for consideration of the defendants' motions for summary judgement. [d/e 36, 42].

### I. BACKGROUND

The plaintiff, Ronnie Davis, filed this lawsuit pursuant to 42 U.S.C. §1983 claiming that his constitutional rights were violated at the East Moline Correctional Center. On August 25, 2006, the court conducted a merit review of the plaintiff's complaint and found that the plaintiff had adequately alleged that Director of the Illinois Department of Corrections Roger Walker, East Moline Correctional Center Warden Gene Jungwirth, Dr. William Rankin and Health Care Administrator Andrea Lashbrook violated the plaintiff's Eighth Amendment rights when they were deliberately indifferent to his serious medical condition. The claim is against the defendants in their individual capacities only.

Specifically, the plaintiff alleged that he was taken to an outside hospital in March of 2005 for a biopsy to determine if he had prostate cancer. The plaintiff did not have cancer, but says he developed new medical problems as a result of the biopsy. The plaintiff claims he filed numerous grievances, but the defendants refused him further treatment.

### II. FACTS

The following facts are taken from the defendants' statement of undisputed facts and the plaintiff's response. The plaintiff was housed at the East Moline Correctional Center for approximately three years. The plaintiff admits he is familiar with the requirements for requesting to see a doctor. (Def. Memo, Plain. Ex., p. 6),

Defendant Dr. William Rankin is the Medical Director at East Moline Correctional Center and has provided medical care to the plaintiff. Dr. Rankin says he first saw the plaintiff

1

in November of 2004 for his bi-annual physical. When performing the rectal examination, the doctor noted an abnormal mass in the left lobe of the prostate. The doctor recommended further testing which was performed a few days later.

On December 3, 2004, Dr. Rankin met with the plaintiff again to review his test results. The doctor noted that "the patient looked well and had a suspect prostate." (Def. Memo, Rankin Aff. p. 2). The doctor ordered another PSA test used to measure the risk of prostate cancer in three months. Dr. Rankin says the plaintiff has also tested positive for Hepatitis C. The doctor ordered further testing and vaccinations for Hepatitis A and B.

A second PSA test was performed on March 3, 2005. Based on the results, the doctor believed further testing was necessary and got approval for a urology consult. On March 21, 2005, the plaintiff was sent to an outside urology group and was evaluated by Dr. Lubbers.

Dr. Lubbers says after his examination, he recommended an ultrasound and biopsy of the plaintiff's prostate. Dr. Lubbers says he "described the procedure to the patient and warned him of the risk of bleeding and infection. All of his questions were answered." (Def.Memo., Lubbers Aff, p. 2)

Dr. Rankin says he relied upon Dr. Lubbers' assessment for the plaintiff's follow up care. Dr. Rankin met with the plaintiff again on March 29, 2005, and discussed the procedure. The plaintiff stated that he wanted to proceed and an appointment was scheduled.

On April 4, 2005, Dr. Lubbers performed a transrectal ultrasound and biopsy of the prostate on the plaintiff. Another doctor at East Moline Correctional Center reviewed the results with the plaintiff on April 18, 2005. There was no evidence of cancer, but the pathology report did show chronic inflamation and atrophy. The doctor noted the plaintiff looked well on this visit. The medical record indicate no complaints relating to the biopsy procedure. (Def. Memo, Rankin Aff., p. 4). The plaintiff was also examined during a routine follow-up on May 10, 2005, and reported no complaints. The plaintiff disagrees and says he did complain about his medical condition.

On June 17, 2005, the plaintiff reported to sick call complaining of mid-back pain and pain in his left buttock cheek. The plaintiff said the problem started after the biopsy and never went away. He reported no other problems and no distress was noted. The plaintiff asked to see a doctor. A registered nurse obtained a urine sample and it was within normal limits.

Dr. Rankin saw the plaintiff on June 20, 2005. The medical record states:

Complains of back pain for two months. Complains of no erections, all since
his prostate biopsy, but was able to masturbate to ejaculate. Noted blood

2

in semen. (Def. Memo. Rankin Aff. p. 5)

Dr. Rankin says he assessed the plaintiff with hemotospermia or blood in semen based on the plaintiff's complaints. The doctor says that based on the examination, the plaintiff:

> was in no distress and despite his complaints, was able to masturbate to ejaculation. Thus, in my medical opinion, Mr. Davis' complaints were not serious medical needs that required a different course of treatment. His condition is treated with an antibiotic, which I prescribed. (Def. Memo, Rankin Aff, p. 5)

The plaintiff was seen at Stateville Correctional Center for a routine follow-up examination on July 12, 2005. The medical records note no complaints at this time. The plaintiff had another PSA test on August 3, 2005. Dr. Rankin reviewed the test with the plaintiff on August 5, 2005. The doctor ordered follow-up care for Hepatitis C.

On August 10, 2005, Dr. Rankin noted that the plaintiff was still showing signs of chronic inflamation so medication was prescribed.. The plaintiff complained again of lower back pain, difficulty with an erection and hemotospermia. Dr. Rankin states that he "did not consider Mr. Davis' condition a serious medical need that required a different form of treatment." (Def.Mot, Rankin Aff, p. 6).

Dr. Rankin next saw the plaintiff on October 21, 2005. The plaintiff complained that he sometimes felt bloated. Dr. Rankin saw the plaintiff again on October 25, 2005 and he stated that he no longer felt bloated. The plaintiff denies this. The doctor examined the plaintiff and since he still had an inflamed prostate glad, he prescribed another form of antibiotic. (Def. Mot., Rankin Aff., p. 7).

On November 5, 2005, the plaintiff met with a registered nurse and for the first time reported a problem with rectal drainage. The plaintiff saw Dr. Rankin for this problem on December 13, 2005. The plaintiff did not report any blood in his semen at this time. He was unsure of where the drainage originated and nothing usual was observed during the examination. The plaintiff was asked to monitor his condition.

Dr. Rankin again examined the plaintiff at the request of the warden on January 13, 2006. The plaintiff says he had to complaint to the warden to get medical care. The plaintiff again stated that he had rectal drainage, but nothing usual was detected during the examination. Further testing was ordered and performed on January 17, 2006.

Dr. Rankin says he re-examined the plaintiff on February 2, 2006. The plaintiff reported feeling okay, but complained of some back pain. The doctor scheduled the plaintiff for follow-up in the

3

general medical clinic in four weeks.  The plaintiff was seen in the Hepatitis Clinic on March 26, 2006; April 13, 2006 and June 21, 2006.   The plaintiff was seen on numerous occasions after this as well, but made no further complaint concerning the claims in his complaint. (Def.Memo, Dr. Rankin Aff, p. 11) The plaintiff disputes this claim and says he still has blood in his semen to this date.

   Dr. Rankin says he believes the biopsy should have been performed in the plaintiff's case due to the abnormal examination and elevated PSA levels.   The doctor says he reviewed the potential risks, and the plaintiff stated that he wanted to proceed.  Dr. Rankin says the biopsy procedure:

> is associated with minor side effects including hematuria (blood in urine) and hematochezia (rectal bleeding), both of which are common side effects.  Mr. Davis, however, did not suffer from either one of these.  Delayed minor side effects......(which commonly occur at three to seven days post-biopsy) can include vague pelvic discomfort and hemotospermia (blood in semen).  These minor side effects are self-limited and most often do not require any treatment.  Blood can occur in urine, semen and bowel movements from a few days to a few weeks.  In rare occasions, it may last longer, as in this case with Mr. Davis' hemotospermia.(Def. Memo, Dr. Rankin Aff, p. 9-10)

   Dr. Rankin says he believes the blood in the plaintiff's semen and the possible dull pain may have been minor side effects form the biopsy, but he does not believe the plaintiff was ever suffering from a serious medical condition.  In addition, the doctor states that the plaintiff was provided appropriate treatment for all of his complaints and none of the conditions complained of in his complaint "placed him at substantial harm or constituted serious medical needs." (Def. Memo, Rankin Aff, p. 11).

   Dr. Lubbers says he did advise the plaintiff prior to the biopsy, that bleeding may be a temporary symptom.  However, he says it is "distinctively unusual for blood in the semen to last months after the procedure." (Def. Memo, Lubbers Aff. p. 3).   Dr. Lubbers says it is his medical opinion that the rectal damage complained of and the erectile dysfunction is not related to the biopsy. (Def. Memo, Lubbers Aff, p. 3)   Dr. Lubbers also points out that erectile dysfunction is not uncommon for a man of the plaintiff's age.  The plaintiff was 55 when he saw Dr. Lubbers.

   Defendant Gene Jungwirth says he was the Warden at East Moline Correctional Center.  The defendant says he was responsible for the overall administration of the operations of the institution which houses approximately 1, 100 inmates and employs approximately 250 people.

   Defendant Jungwirth says he has reviewed the December 13, 2005 grievance written by the plaintiff.   The defendant says although the name at the bottom of the grievance is his, he gave his signature authority to Assistant Warden of Programs Steve Ballard.  The defendant says he did not personally review or make the final decision concerning the grievance. (Def. Memo, Jung. Aff, p. 1) In addition, the Warden says he has no medical training and relies on his medical staff to provide health care treatment to the inmates.

Defendant Andrea Lashbrook says she was the Acting Health Care Unit Administrator at East Moline Correctional Center. The defendant says she is not a trained doctor nor is she trained or licensed to diagnose medical conditions. She cannot overrule the medical decisions made in the Health Care Unit.

Terri Anderson is the Chairperson of the Office of Inmate Issues. Anderson says she has reviewed the December 13, 2005 grievance from the plaintiff concerning his medical care. She states that Director Walker's signature on the Administrative Review Board memo denying his grievance was not signed by the director, but by Anderson. In addition, Anderson says she has reviewed all Administrative Review Board records concerning the plaintiff and found no grievance concerning medical care which mentions Warden Jungwirth or Director Walker.

### III. LEGAL STANDARD

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56©. Any discrepancies in the factual record should be evaluated in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

"Summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events. *Johnson v. Cambridge Indus.*, Inc., 325 F.3d 892, 901 (7th Cir. 2000). A party opposing summary judgment bears the burden to respond, not simply by resting on its own pleading but by "set[ting] out specific facts showing a genuine issue for trial." *See* Fed. R. Civ. P. 56(e). In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If [the nonmovant] does not [meet his burden], summary judgment should, if appropriate, be entered against [the nonmovant]." Fed. R. Civ. P. 56(e).

Affidavits must be based on the personal knowledge of the affiant and "set out *facts* that would be admissible in evidence." Fed. R. Civ. P. 56(e) (emphasis added). Personal knowledge may include inferences and opinions drawn from those facts. *Visser v. Packer Eng. Assoc., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991). "But the inferences and opinions must be grounded in observation or other first-hand personal experience. They must not be based on flights of fancy, speculations, hunches, intuitions or rumors remote from that experience." *Visser*, 924 F.2d at 659.

IV. ANALYSIS

All of the defendants argue that the plaintiff cannot demonstrate that they were deliberately indifferent to his serious medical needs. The plaintiff must pass both an objective and a subjective test in order to establish that the defendants violated the Eighth Amendment. *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981); *Wilson v. Seiter,* 501 U.S. 294, 297 (1991). The first prong of the test requires the plaintiff to demonstrate that the alleged deprivation was sufficiently serious. *Id*. The Seventh Circuit has acknowledge that a "serious medical need" is far from "self-defining." *Gutierrez v Peters,* 11 F3d 1364, 1370 (7th Cir. 1997). However, the court noted that the Supreme Court clearly intended to include not only conditions that are life-threatening, but also those in which denial or delay in medical care results in needless pain and suffering. *Id.* On the other hand, "to say that the Eighth Amendment requires prison doctors to keep an inmate pain-free in the aftermath of proper medical treatment would be absurd." *Snipes v Detella,* 95 F. 3d 586, 592 (7th Cir. 1996).

The second prong of the Eighth Amendment test requires the plaintiff to show that the defendants acted with deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). "[A] finding of deliberate indifference requires evidence that the official was aware of the risk and consciously disregarded it nonetheless." *Mathis v. Fairman*, 120 F.3d 88, 91 (7th Cir. 1997)(citing *Farmer* at 840-42) Inadequate medical treatment due to negligence or even gross negligence does not support an Eighth Amendment violation. *Shockley v Jones*, 823 F.3d 1068, 1072 (7th Cir. 1987). In addition, inmates are not entitled to a specific type of treatment, or even the best care, only reasonable measures to prevent a substantial risk of serious harm. *Forbes v. Edgar,* 112 F.3d, 262, 267 (7th Cir. 1997).

"[P]roof of deliberate indifference may be found where a prison official intentionally denies or delays access to medical care or intentionally interferes with the treatment once prescribed." *Jones v. Natesha* ,151 F.Supp.2d 938, 945 (N.D. Ill. 2001) *citing Ford,* 2001 WL 456427 at 6.   However, "an inmate who complains that delay in medical treatment rose to constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *Langston v Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996).

The plaintiff alleges that after a biopsy in April of 2005, he began to suffer from blood in his semen, erectile dysfunction, wet spots near his rectum and low back pain.  Even if the plaintiff could show that he suffered from a serious medical condition, the record before the court shows that the plaintiff was repeatedly seen and treated by Dr. Rankin and other medical personnel.  The plaintiff was not denied medical care.   Dr. Rankin states that he does not believe any of the plaintiff's complaints constitute a serious medical need, nor that he faced any serious danger.   The fact that the plaintiff disagrees with Dr. Rankin's opinion and his treatment does not rise to the level of a constitutional violation.  The plaintiff has not demonstrated that the

defendant was aware of a risk to the plaintiff and disregarded it or that he was in any other way deliberately indifferent to the plaintiff's medical needs.

The plaintiff's main complaint seems to be that he was given an unreasonable and unwarranted biopsy that did nothing but cause additional problems. The plaintiff admits he did consent to the procedure, but he says that was only because doctors lead him to believe there was good chance he had prostate cancer. The plaintiff says he did not have cancer, so the procedure was not needed.

The plaintiff's argument puts medical personnel in an impossible position. The point of performing additional testing it to determine with greater certainty what condition a patient has and what is the appropriate form of treatment. Dr. Rankin had already ordered initial testing which indicated the plaintiff might have prostate cancer. The plaintiff was sent to an outside specialist. A biopsy was recommended and the plaintiff was informed of the possible side effects. If the defendant had ignored the fact that the plaintiff had an abnormal mass, had failed to order any additional testing, had not recommended an evaluation by an outside specialist or a biopsy and the plaintiff did in fact have cancer, the plaintiff would have a much stronger case against this defendant.

In addition, the plaintiff has filed a lawsuit in federal court pursuant to §1983. "[T]he Eighth Amendment is not a vehicle for bringing claims of medical malpractice." *Snipes v. Detella*, 95 F.3d 586, 590 (1996); *see also Gutierrez v Peters,* 111 F.3d 1364, 1374 (7th Cir. 1997)("[M]edical malpractice in the form of an incorrect diagnosis or improper treatment does not state an Eighth Amendment claim.")

There is also no evidence that the other, non-medical defendants were deliberately indifferent to the plaintiff's medical claims or in any way interfered with his treatment. "If a prisoner is under the care of medical experts....a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Spruill v Gillis,* 372 F.3d 218 (3rd Cir. 2004). The motions for summary judgement are granted.

**ITS IS THEREFORE ORDERED that:**

**1) The defendants' motions for summary judgement are granted pursuant to Fed. R. Civ. P. 56. [d/e 36, 42]. The clerk of the court is directed to enter judgment in favor of the defendants in accordance with this order. The parties are to bear their own costs. This case is terminated.**

**2) If the plaintiff wishes to appeal this dismissal, he may file a notice of appeal with this court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff**

plans to present on appeal.  *See* **Fed. R. App. P. 24(a)(1)©.  If the plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee irrespective of the outcome of the appeal.  Furthermore, if the appeal is found to be non-meritorious, the plaintiff may also accumulate another strike under 28 U.S.C. 1915(g).**

**3) The agency having custody of the plaintiff is directed to remit the docketing fee of $350.00 from the plaintiff's prison trust fund account if such funds are available.  If the plaintiff does not have $350.00 in his trust fund account, the agency must send 20 percent of the current balance, or the average balance during the past six months, whichever amount is higher; thereafter, the agency shall begin forwarding monthly payments from the plaintiff's trust fund account to the clerk of court each time the plaintiff's account exceeds $10.00 until the statutory fee of $350.00 is paid in its entirety.  The filing fee collected shall not exceed the statutory filing fee of $350.00.**

**4) The plaintiff must notify the clerk of the court of a change of address and phone number within seven days of such a change.  Release from incarceration does not relieve the plaintiff of his obligation to pay the filing fee in full.**

**5) The clerk is directed to mail a copy of this order to the plaintiff's place of confinement, to the attention of the Trust Fund Office.**

Entered this 10th day of March, 2008.

s\Harold A. Baker
_____
HAROLD A. BAKER
UNITED STATES DISTRICT JUDGE